# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRIAN CLAYTON,                )
                              )
           Plaintiff,         )   Civil Action No. 14-400
                              )
      v.                      )
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security, )
                              )
           Defendant.         )

## MEMORANDUM OPINION

**NORA BARRY FISCHER, District Judge.**

## I. INTRODUCTION

Brian Clayton ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. This matter comes before the Court on cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. (ECF. Nos. 9, 11). The record has been developed at the administrative level. (ECF No. 7).[1] For the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 9) is DENIED and Defendant's Motion for Summary Judgment (ECF No. 11) is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed his application for benefits on March 2, 2011, alleging a disability onset of January 1, 2011, due to schizoaffective disorder. (R. at 144-52). His application was denied on March 18, 2011 (R. at 54-58). At Plaintiff's request, a hearing was held on August 23, 2012, before Administrative Law Judge Leslie Perry-Dowdell ("ALJ"). (R. at 24-44). Plaintiff testified

---

[1] References to the administrative record (ECF No. 7), will be designated by the citation "(R. at ___)".

1

at the hearing with the assistance of Barbara S. Manna, a non-attorney representative. (R. at 25-41). An impartial vocational expert, Tania Shullo, also appeared and testified. (R. at 41-44).

On September 21, 2012, the ALJ issued a written decision denying benefits. (R. at 9-23). Plaintiff's request for review by the Appeals Council was denied (R. at 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). Plaintiff filed the instant action on March 26, 2014 (ECF No. 3), and the parties subsequently filed cross-motions for summary judgment. (ECF Nos. 9, 11). The matter has been fully briefed and is ripe for disposition.[2]

## III. BACKGROUND

*A. General Background*

Plaintiff was born on August 13, 1985, and was 25 years old on the alleged disability onset date. (R. at 19). He graduated high school in 2003 and attended college at California University of Pennsylvania until 2008. (R. at 34, 313, 508, 522). In 2010, Plaintiff took additional college courses online through Kaplan University. (R. at 34, 36, 219, 438).

In the summer of 2010, Plaintiff worked for the United States Census Bureau, going door-to-door and assisting residents with filling out a questionnaire. (R. at 166). From 2010 through 2012, Plaintiff assisted his father in a retail clothing store by hanging clothes, cleaning, and working a cash register. (R. at 219, 235, 241, 250, 253, 259, 263, 283, 291, 522, 534, 545, 559, 561). Plaintiff worked for his father approximately five hours per day, two days per week. (R. at 522, 534).

At the time of the administrative hearing, Plaintiff lived with his mother and visited with his brother and sister on a weekly basis. (R. at 33). Plaintiff had no problems with personal care and was able to assist his mother with household chores including cooking, cleaning, and laundry. (R. at 39, 172). Plaintiff reported that he engaged in recreational activities such as going to the gym two or three times a week, using his computer to study computer programming and the Japanese language, interacting on Facebook and online dating websites, and playing

---

[2] On February 6, 2014, Plaintiff filed a second application for SSI benefits. (ECF No. 10 at 1). On April 16, 2014, Plaintiff was awarded disability benefits commencing February 6, 2014. (*Id.*). The instant action challenges the Commissioner's denial of SSI benefits for the period of time between January 1, 2011, and February 6, 2014.

video games. (R. at 27-28, 30-31, 516-22, 529-37). Through a referral from his therapist, Plaintiff also traveled to a rehabilitation "clubhouse" approximately three times a week and performed tasks such as running a cash register, cooking, and selling candy. (R. at 27-28). Plaintiff used public transportation to travel to the clubhouse and other locations around the city. (R. at 30-31, 40, 174, 514, 516).

### B. Medical Background

The record reflects that Plaintiff initially presented for mental health treatment on December 15, 2009 at the University of Pittsburgh Medical Center (UPMC) Western Psychiatric Institute and Clinic (WPIC) and was diagnosed with schizoaffective disorder. (R. at 271-278). Upon discharge, Plaintiff was assessed with a Global Assessment of Functioning ("GAF") score of 50.[3] (R. at 274). Plaintiff was instructed to commence treatment in the form of individual and group therapy and was prescribed Risperdal and Zoloft. (R. at 206).

At a follow up appointment on January 6, 2010, Plaintiff arrived neatly groomed and was pleasant and cooperative. (R. at 499). He maintained eye contact, was fully oriented, and had organized thoughts and goals. (R. at 499). However, he also appeared anxious and tense and displayed poor concentration, poor insight, and fair judgment. (R. at 499). He was assessed with a GAF score of 45. (R. at 499).

Throughout 2010, Plaintiff engaged in weekly group therapy sessions at WPIC. (R. at 235-70). Plaintiff spoke up infrequently during the early months of his group therapy, although his participation was always attentive and appropriate. (R. at 261, 267-70). By the end of the year, however, Plaintiff had become a consistently active and attentive participant in group activities. (R. at 235-48). Although Plaintiff infrequently initiated conversations, he was

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed. 2000). An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation....)" OR "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

3

responsive and attentive to other group participants, worked well collaboratively, and generally displayed a brighter and more engaging affect. (R. at 235-44).

At a mental status exam on December 16, 2010, Plaintiff was again assessed with a GAF score of 45. (R. at 316). Treatment notes reflect that Plaintiff was fully oriented, exhibited intact thought processes, memory, attention and concentration, denied experiencing any hallucinations or self-injurious thoughts, and demonstrated good insight and judgment. (R. at 315). However, he indicated also that he was depressed, struggling with motivation, and concerned about his lack of focus and concentration. (R. at 317).

On January 11, 2011 - shortly after his alleged disability onset date - Plaintiff presented for an individual therapy session with a social worker. (R. at 232). Plaintiff reported that his depression, motivation, energy and interest continued to improve. (R. at 232). His affect was pleasant and he denied any unusual thoughts or intrusive thinking. (R. at 232). His concentration and motivation remained his primary concerns. (R. at 232).

On March 20, 2011, Plaintiff presented to his primary care physician, Konasale Prasad, M.D., for medication management. (R. at 219-225). Plaintiff was clean, alert, cooperative, and his affect was congruent and broad. (R. at 222). He was smiling and pleasant, described his mood as "fine," and displayed full orientation, logical thought form, good insight and judgment, and intact memory, attention and concentration. (R. at 222). Plaintiff denied any anxiety, hallucinations, delusions, or self-injurious thoughts, and indicated that things were "going well." (R. at 219-222). However, he continued to suffer from low concentration and motivation. (R. at 219). He was assessed with a GAF score of 60. (R. at 223).

On April 27, 2011, a state agency physician, Arlene Rattan, Ph.D., completed a mental residual functional capacity (RFC) assessment. (R. at 45-52). Dr. Rattan concluded that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, work in proximity or in coordination with others without distraction, complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and criticism from supervisors, get along with co-workers, and respond appropriately to changes in the work setting. (R. at 49-50).

Plaintiff displayed marked limitations in his ability to interact appropriately with the general public. (R. at 50). Otherwise, Plaintiff was not found to be significantly limited. (R. at 49-50). Dr. Rattan concluded that Plaintiff was capable of making simple decisions, carrying out short and simple instructions, sustaining an ordinary routine without special supervision, and meeting the basic mental requirements of competitive work on a sustained basis. (R. at 49-51).

Throughout 2011, Plaintiff continued to participate in group therapy on a weekly basis. Although Plaintiff remained quiet, he was attentive, consistently provided support and feedback to other participants, and displayed well-organized thoughts. (R. at 226-234). He actively participated in group exercises and worked well with other participants. (R. at 217-18, 290, 293-98, 300, 562).

At a medication management appointment on July 21, 2011, Plaintiff described his mood as "ok," but reported that he was frequently tired from staying up all night playing video games with a group online. (R. at 283). He indicated that his concentration and attention span had been "bad" lately, but denied any panic, anxiety, restlessness, delusions, hallucinations or self-injurious thoughts. (R. at 283-87). Upon examination, he was fully oriented, his insight and judgment were good, his memory, attention, and concentration were intact, and his thoughts were logical. (R. at 287). The examining physician noted that Plaintiff seemed "up beat" and assessed him with a GAF score of 60. (R. at 288).

On August 24, 2011, Plaintiff informed his individual therapist, Dr. Robert Feragotti, that he had stopped taking his medication because he felt that it had caused him to gain weight. (R. at 558). Plaintiff was instructed to meet with Dr. Prasad the following day to discuss his concerns about his medication, but Plaintiff skipped the appointment. (R. at 556). Two days later, on August 27, 2011, Plaintiff was apprehended by Pittsburgh police while running naked along a parkway. (R. at 556-57). While in custody, he exhibited bizarre behaviors such as lunging at a female police officer, making inappropriate comments, referring to himself as a "masochist" and the "Anti Christ," and reporting that unknown individuals were out to get him for "telling the truth." (R. at 556-57). Plaintiff was admitted to a regional hospital and remained hospitalized until September 15, 2011. (R. at 555).

On September 19, 2011, Plaintiff indicated that he was feeling better following his episode with the police and that he was "melancholic but not depressed." (R. at 554). He discussed his hospitalization with his therapist and expressed a desire to continue working with his treatment team to maintain psychiatric stability. (R. at 555). Plaintiff also indicated that he had resumed taking his medication and would continue to do so. (R. at 555).

On September 26, 2011, Plaintiff informed his therapist that he no longer intended to go to group therapy and that he wanted to "do things [his] own way now." (R. at 542). He reported that he had been taking his medication consistently with no side effects and felt that the medication was working well to treat his symptoms. (R. at 542).

On October 10, 2011, Plaintiff reported that he had begun going to the gym regularly and was feeling much healthier. (R. at 541). Over the course of several individual therapy sessions conducted between October and December of 2011, Plaintiff consistently expressed coherent, linear, and goal-directed thoughts, dressed appropriately and neatly, and displayed good hygiene and grooming. (R. at 535-45, 554). His memory was within normal limits and he denied hallucinations, paranoia, delusions, or suicidal ideation. (R. at 533-45, 554). Treatment notes from an appointment on December 11, 2011 indicate GAF scores of 50 and 60.

Throughout 2012, Plaintiff continued to attend individual therapy sessions and appointments for medication management. He always dressed appropriately, displayed good grooming and hygiene, and was alert, cooperative, and pleasant. (R. at 502-29). He engaged easily and cooperatively with his therapist, maintained normal speech and fair eye contact, and indicated that his mood was good. (R. at 502-09, 513-21, 526, 529). He remained fully oriented and consistently denied suicidal ideation, hallucinations, delusions or paranoia. (R. at 502-09, 513-22, 526, 529). On May 25, 2012, Plaintiff was assessed with GAF scores of 55 and 60. (R. at 527-28).

*B. Administrative Hearing*

Plaintiff testified that he spent the majority of his time working at a clubhouse for people with disabilities, performing household chores, teaching himself computer programming and a

foreign language, playing video games and visiting social networking websites. (R. at 27-29, 31). Plaintiff stated that he wanted to continue with his college education but that he was hypersensitive to stress and unable to focus. (R. at 36-37). He testified that he had previously helped his father at a retail clothing store but was unable to continue because he made too many mistakes. (R. at 40-41).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of the same age, education and work experience as the Plaintiff would be capable of performing any full-time jobs in the national economy if limited to simple, routine and repetitive tasks in a work environment free of fast paced production requirements involving only simple work-related decisions and routine workplace changes. (R. at 42). The vocational expert responded that such an individual could perform the jobs of dishwasher, dining room attendant, and dishwasher. (R. at 42-43). The vocational expert further testified that no jobs would be available if such an individual was regularly off-task for more than 20 percent of the workday due to psychological symptoms. (R. at 43).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Social Security Act, an individual must demonstrate that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any

other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review, as a whole, the transcripts and records upon which a determination of the Commissioner is based. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura*, 55 F. 3d at 901 (quoting *Richardson,* 402 U.S. at 401). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d Cir. 1986).

**V. DISCUSSION**

In her decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 2, 2011, the date of his application. (R. at 14). The ALJ further found that Plaintiff's schizoaffective disorder was a severe impairment, but determined at step three that Plaintiff's impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1 of the regulations. (R. at 14-15). Despite his impairment, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels provided that he is restricted to simple, routine and repetitive tasks, required to make only simple work-related decisions, and employed in a work environment free of fast paced production requirements and involving only routine work place changes. (R. at 15). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing. (R. at 19-20). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to discuss or mention four GAF scores of 50 or below that Plaintiff received between December 23, 2009, and December 8, 2011. As a general matter, GAF scores "are medical evidence that must be addressed." *Marsico v. Colvin*, 2014 WL 1340213, at *2

9

(W.D. Pa. Apr. 3, 2014) (citing *Bonani v. Astrue*, 2010 WL 5481551 (W.D. Pa. Oct. 15, 2010)). Several district courts in this circuit have held that an ALJ's "failure to discuss a GAF score that supports serious impairments in social or occupational functioning requires remand." *Bonani*, 2010 WL 5481551 at * 7. *See also Rivera v. Astrue*, 2014 WL 1281136 (E.D. Pa. Mar. 27, 2014) (collecting cases standing for the proposition that an ALJ's failure to discuss a GAF score indicating serious impairment is cause for remand); *West v. Astrue*, 2010 WL 1659712, at *4-6 (E.D. Pa. Apr. 26, 2010) (remanding for failure to consider GAF scores and collecting cases taking the same approach). Similarly, courts have recognized that an ALJ may not "cherry-pick" higher GAF scores in his or her analysis while ignoring GAF scores that may support a disability. *See Colon v. Barnhart*, 424 F.Supp.2d 805, 812 (E.D. Pa. 2006); *Dougherty v. Barnhart*, 2006 WL 2433792, at *9 (E.D. Pa. Aug. 21, 2006).

On the other hand, the Third Circuit has cautioned that "[a] GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue*, 351 F. App'x 714, 716 (3d. Cir. 2009); *Coy v. Astrue*, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (noting that "the Social Security Administration has explicitly declined to endorse the use of the GAF scale because its scores do not have a direct correlation to the disability requirements and standards of the Act."). Moreover, while a GAF score may indicate an individual's capacity to work, it can also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score alone is insufficient to establish disability. *See, e.g., Coy,* 2009 WL 2043491, at *14 (citing *Chanbunmy v. Astrue*, 560 F .Supp.2d 371, 383 (E.D. Pa. 2008)). Consequently, where a treating source has failed to provide specific limitations findings to explain a given GAF score, or to tie the GAF score into some explanation of a claimant's ability to work, an ALJ need not provide a specific assessment of the GAF score. *Gilroy*, 351 F. App'x at 716.

In the instant case, Plaintiff contends that the ALJ improperly disregarded the following four GAF scores: a score of 50 assessed on December 23, 2009 (R. at 274); a score of 45 assessed on January 6, 2010 (R. at 499); a score of 45 assessed on December 16, 2010 (R. at 316); and a score of 50 assessed on December 8, 2011 (R. at 551). As an initial matter, the Court

notes that the first two GAF scores referenced by Plaintiff – those assessed on December 23, 2009, and January 6, 2010 – were each issued approximately one year prior to the alleged onset of Plaintiff's disability. Those scores are of limited relevance. *See, e.g., McCormick v. Astrue*, 2010 WL 1740712, at *6 (D. Del. April 30, 2010) (holding that the ALJ had not erred in failing to consider a GAF score of 42 because that score had been assessed eleven months prior to the alleged date of onset). *See also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance."); *Bonds v. Astrue*, 2012 WL 4026561, at *5 n. 4 (E.D. Va. Aug. 22, 2012) (finding that the ALJ did not err in ignoring evaluations that occurred prior to the alleged onset date); *Ingham v. Astrue*, 2010 WL 1875651, at *3 (C.D. Cal. May 10, 2010) ("[M]edical opinions of any physician, treating or examining, which predate the alleged onset of disability are not considered substantial evidence.").

With respect to the GAF scores of 45 and 50 that were assessed during the relevant time period (or in sufficient proximity thereto), Plaintiff is correct that the ALJ did not specifically mention these two scores in her determination. Notwithstanding that failure, the Court concludes that remand on this basis is unwarranted. As this Court has frequently observed, "[l]ow GAF scores, standing alone, are never enough to satisfy the claimant's burden to show that he is disabled." *Chetoka v. Colvin*, 2014 WL 295035, *13 (W.D. Pa. Jan. 27, 2014) (quoting *Wuerger v. Colvin*, 2013 WL 2254244, at *14 (W.D. Pa. May 22, 2013)). *See also Grier v. Colvin*, 2014 WL 5089744, *3 (W.D. Pa. Oct. 9, 2014) (noting that "a GAF score alone is not dispositive of whether a claimant is mentally disabled.") (citing *Gilroy*, 351 F. App'x at 716). Rather, "[a]n ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record." *Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011). In the instant case, Plaintiff has not made any attempt to demonstrate that his GAF score alone would have satisfied the requirement for disability, particularly in light of the Third Circuit's observation that a GAF score of 50 is indicative that a claimant can "perform some gainful

11

activity." *See Hillman v. Barnhart*, 48 F. App'x 26, 29 n.1 (3d Cir. 2002); *Liggitt v. Comm'r of Soc. Sec.*, 2011 WL 2458054, at *11 n.6 (W.D. Pa. May 20, 2011). Moreover, as in *Gilroy*, neither of the pertinent GAF scores was accompanied by "any opinions regarding specific limitations" on Plaintiff's ability to work. (R. at 316, 551). *See Gilroy*, 351 F. App'x at 716. Consequently, the Court finds that the ALJ's failure to reference those scores was supported by substantial evidence.[6] *See Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 535 (3d Cir. 2011) (concluding that the ALJ's failure to discuss two GAF scores of 50 was not erroneous in light of the record as a whole); *Gilroy*, 351 F. App'x at 716 ("Given the failure of Dr. Wang to 'express any opinions regarding specific limitations' or otherwise explain the basis for his GAF rating, we are at a loss to understand how the ALJ could have responded to that rating in a more satisfactory manner.").

Plaintiff next contends that the ALJ improperly failed to account for Plaintiff's moderate limitations in social functioning when crafting her hypothetical question for the vocational expert. In determining that Plaintiff's mental impairment did not meet or medically exceed a listed impairment at step three of the sequential evaluation process, the ALJ made a factual finding that Plaintiff experienced the following limitations: "mild limitation in activities of daily living; moderate difficulties in maintaining social functioning: [and] moderate difficulties in maintaining concentration, persistence or pace." (R. at 14). The ALJ subsequently determined that, despite his moderate impairment in social function, Plaintiff had the residual functional capacity to perform work without any explicit limitation on interactions with co-workers, supervisors, or the general public. (R. at 15-18). Consequently, the ALJ's hypothetical question to the vocational expert accounted for Plaintiff's moderate limitations in concentration, persistence and pace, but did not incorporate Plaintiff's moderate limitation in social functioning. (R. at 42). The ALJ explained this omission by noting that, despite his impairment, Plaintiff was

---

[6] The Court also notes that the GAF score of 50 assessed on December 8, 2011, appeared in a report that also indicated a GAF of 60. Although the ALJ did not explicitly reference the lower GAF score, she did explain that Plaintiff's function during that time period was briefly impaired by his refusal to take his medication and that his GAF scores increased once he resumed his medications.

able to take college classes, use public transportation, and visit with his relatives on a weekly basis. (R. at 16).

It is well-settled that an ALJ must "accurately convey to the expert all of the claimant's credibly established limitations." *Valansky v. Colvin*, 2014 WL 469893, at * 2 (W.D. Pa. Feb. 6, 2014) (internal quotations omitted). "Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). However, such limitations must be supported by the record. *Galvin v. Comm'r of Soc. Sec.*, 2009 WL 2177216, at *10 (W.D. Pa. July 22, 2009); *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004).

The Third Circuit's decision in *Ramirez* is instructive. In *Ramirez*, the ALJ expressly found that the plaintiff "often" suffered from "deficiencies of concentration, persistence, or pace." *Id*. at 552. However, the only expressed limitation in the ALJ's hypothetical question that pertained to the plaintiff's deficiencies in concentration and pace was a restriction to "no more than one or two-step tasks." *Id*. at 554. The Third Circuit concluded that a hypothetical question must contain "greater specificity" with respect to a claimant's mental or physical limitations if those limitations are established by the record. *Id*. (quoting *Burns v. Barnhart*, 312 F.3d 113, 122 (3d Cir. 2002). After reviewing the record, the Court concluded that the limitations in that case were adequately supported and remanded with instructions for the ALJ to craft a hypothetical that reflected the full range of the claimant's impairments. *Id*. at 555.

In the instant case, unlike in *Ramirez*, substantial evidence supported the ALJ's decision not to incorporate a limitation on social function in her hypothetical question. The record reflects that, during the alleged period of disability, Plaintiff was able to take college courses, travel to visit relatives using public transportation, assist his father in a retail clothing store, engage in social interaction on Facebook and online dating sites, participate actively in group therapy, and work out at a gym several times a week. Plaintiff also traveled to a rehabilitation clubhouse approximately three times a week and performed tasks such as running a cash register, cooking, and selling candy. In short, the record provides ample evidence to support the ALJ's

13

decision not to incorporate an explicit restriction on social function into her hypothetical question. *See, e.g., Galvin*, 2009 WL 2177216, at *10 (holding that, although the ALJ found moderate deficiencies in several areas of function, the record did not support the need for a more specific incorporation of those limitations into the plaintiff's residual functional capacity); *Briggs v. Astrue*, 2013 WL 607833, at *11 (W.D. Pa. Feb. 19, 2013) (ALJ's hypothetical question was not required to include a limitation on plaintiff's ability to interact with others because such a limitation was not supported by the record); *Christner v. Astrue*, 2009 WL 186010, at *9 (W.D. Pa. Jan. 27, 2009) (same).

In urging a different result, Plaintiff relies heavily on the recent decisions in *Valansky v. Colvin*, 2014 WL 469893, and *Seagraves v. Colvin*, 2014 WL 657549 (W.D. Pa. Feb. 20, 2014). In *Valansky*, the ALJ determined, for reasons that are not described in the court's decision, that the plaintiff had moderate limitations in social functioning. *Valansky*, 2014 WL 469893, at * 2 (W.D. Pa. Feb. 6, 2014). The hypothetical question posed by the ALJ restricted the plaintiff to "simple work-related decisions," but omitted any limitation on interactions with other people. *Id*. The court remanded, concluding that the hypothetical "was not substantial evidence" because it failed to "accurately portray" the plaintiff's "moderate limitations in social functioning." *Id*.

In *Seagraves*, as in *Valansky*, the ALJ expressly determined that the plaintiff had "moderate" limitations in social functioning based on the evidence of record. *Seagraves*, 2014 WL 657549, at * 2. However, the ALJ's hypothetical question contained no limitations on social interaction. *Id*. The court remanded, concluding that, "[i]f an ALJ expressly finds moderate limitations in social functioning, a hypothetical that does not address that limitation is insufficient." *Id*. at *1 (citing *Valansky*, 2014 WL 469893, at *2).

Plaintiff contends that *Seagraves* and *Valansky* are "directly on-point." (ECF No. 10 at 11 n. 12). However, because neither opinion provides any factual background, it is impossible to determine what factors supported the outcome in those cases. As discussed above, the need for greater specificity in a residual functional capacity determination or a hypothetical question depends upon the evidence contained in the record. *Ramirez*, 372 F.3d at 554-55; *Briggs*, 2013

WL 607833, at *11. This is a fact specific inquiry. *Galvin*, 2009 WL 2177216, at *10. In the absence of any basis for comparison, *Seagraves* and *Valansky* are inapposite.

## VI.  CONCLUSION

Based on the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 9) is DENIED, Defendant's Motion for Summary Judgment (ECF No. 11) is GRANTED, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

October 24, 2014

cc/ecf: All parties of record.